## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-476 (APM)** |
| **SHANE JASON WOODS,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Shane Jason Woods to 71 months of incarceration, above his advisory Sentencing Guidelines range of 46-57 months,[1] along with three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

### I.    INTRODUCTION

Woods participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[2]

---

[1] The PSR calculates Woods' Guidelines custodial range as 33-41 months, PSR ¶ 127, but this calculation includes granting Woods a three-level reduction for acceptance of responsibility under U.S.S.G. §3E1.1(a-b), *id.* ¶¶ 61-62. As explained below, Woods is not entitled to a reduction for acceptance of responsibility due to his post-plea conduct, and thus his applicable Guidelines range is 46-57 months. The government recommends the Court vary upwards from that range by an additional 24 months for the reasons detailed in this memorandum.

[2] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United

1

Woods came to Washington, D.C. armed with a knife, eagerly anticipating the use of violence. During the riot, Woods assaulted two people without provocation—a uniformed U.S. Capitol Police ("USCP") officer and a Reuters cameraman—injuring the USCP officer and tackling the cameraman with such force that he flew off his feet, hit the ground, and dropped his camera.[3]  In the first attack, Woods approached a small group of USCP officers, including Officer J.F., attempting to hold back the rioters. The officers were in a tactically dangerous situation: they were surrounded, vastly outnumbered, and facing an angry mob that had not been screened for weapons. As Officer J.F. chased after a rioter who had just sprayed her in the face with a chemical irritant, Woods blindsided Officer J.F., ramming into her from the side, knocking her off her feet and sending her crashing into a metal barricade. Officer J.F. experienced immediate physical pain and the next day felt as if she had been "hit by a truck" due to Woods' actions.

A few hours later, Woods committed another, similar violent assault. Woods joined a group of rioters surrounding the media staging area and hurling increasingly aggressive rhetoric at the reporters, cameramen, and technicians gathered there. Not satisfied with merely insulting and threatening these members of the press, Woods and other rioters climbed over barricades and started throwing, kicking, and destroying the piles of recording and broadcasting equipment. As G.P., a Reuters cameraman, attempted to leave the area to protect himself and his camera, Woods took a running start and hit G.P. with a blindside shoulder slam, knocking G.P. to the ground and causing him to drop his camera. It was another vicious, unprovoked assault

---

States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[3] Despite multiple efforts by the government to interview the cameraman, the government does not know whether he was injured or whether his equipment was damaged.

Woods' criminal conduct did not stop on January 6, 2021. While out on bond conditions awaiting sentencing on this case, Woods was pulled over for driving 101 miles per hour on the highway. Woods fled the traffic stop, sped the wrong way down the highway, and caused a multi-car crash that killed a 35-year-old woman. Woods and two other people suffered significant but non-fatal injuries. Later, blood testing revealed that Woods was driving with a 0.177 blood alcohol content, and Woods has admitted that he intentionally drove the wrong way on the highway: he had been trying to crash into a semi-trailer truck. As a result, Woods now faces charges of First Degree Murder in Illinois.

The government recommends that this Court sentence Woods to 71 months' incarceration, which represents a 24-month upward variance from the high end of the applicable Sentencing Guidelines' range of 46-57 months. A 71-month sentence is appropriate in this case because Woods: (1) prepared for violence in D.C. on January 6 by bringing a knife and advising his friend to do the same; (2) was part of the mob that invaded the U.S. Capitol grounds; (3) assaulted and injured Officer J.F.; (4) interfered with Officer J.F.'s official duties by preventing her from apprehending another rioter who had assaulted her with a chemical spray; (5) helped create an environment of chaos and lawlessness where rioters felt that they could violently attack police officers without consequence; (6) surrounded and intimidated members of the media; (7) participated in vandalizing media recording and broadcasting equipment; (8) assaulted G.P., a cameraman who was walking *away* from Woods and other rioters and whom Woods targeted; (9) advocated for further violence; (10) violated his bond conditions by committing multiple new felony offenses, including drunk driving and murder, while awaiting sentencing; (11) killed one person and seriously injured two others as a result of his post-conviction bond violations; and (12)

3

by doing so, demonstrated that he has not turned away from crime, making it inappropriate to award him a sentencing reduction for acceptance of responsibility, *see Puckett v. United States*, 556 U.S. 129, 143 (2009).

Additionally, even after removing the three-level reduction for acceptance of responsibility under U.S.S.G. §3E1.1, Woods' Sentencing Guidelines range understates both his criminal history and his criminal conduct on January 6. First, Woods scored 0 criminal history points according to the Guidelines, and yet has an extensive record of alcohol, driving, and speeding-related convictions, culminating in his post-plea arrest for drunk driving and first-degree murder. An upward departure in his criminal history category is thus appropriate under U.S.S.G. §4A1.3. Second, Woods' January 6 attack on Officer J.F. injured her—causing her whole body to hurt and her to feel like she had been "hit by a truck" the next day—but it is mere luck that Officer J.F.'s injuries were not worse. A similar assault by another January 6 rioter knocked USCP Officer Caroline Edwards unconscious, and she continues to experience symptoms from that head injury.[4] Likewise, G.P. easily could have been severely injured by Woods' attack as well. Woods' blow sent G.P. flying; although his head hit the grass, it came inches away from landing on stone. Finally, due to the Guidelines grouping rules, Woods—unlike other January 6 defendants convicted of multiple assaults—received no additional offense levels for his assault against G.P. *See* PSR ¶ 56. An upward variance is justified and necessary to sentence Woods consistently with other January 6 defendants convicted of similarly serious offenses. *See* U.S.S.G. §3D1.4, n.4.

---

[4] Testimony of Caroline Edwards to the House of Representatives Select Committee to Investigate the January 6th Attack on the United States Capitol, June 9, 2022, *available at:* https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript (last accessed March 30, 2023).

A 71-month sentence adequately reflects the gravity of Woods' planning for violence, his violent conduct on January 6, and his continued advocacy of violence after January 6. It takes into account the deadly indifference to human life he showed while out on bond in this case, the need to avoid unwarranted sentencing disparities, and the goal of deterring Woods—and others who might seek to emulate him—from future violence.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense ("SOO") filed in this case, ECF No. 37, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

### B.    Shane Woods' Role in the January 6, 2021 Attack on the Capitol

#### *Planning for January 6, 2021*

Woods anticipated and planned to participate in violence to achieve his preferred political outcome long before January 6, 2021.

On September 29, 2020, during the first presidential debate, moderator Chris Wallace asked then-President Trump if he would condemn "white supremacist and militia groups" such as the Proud Boys. In response, then-President Trump instructed the Proud Boys to "stand back and stand by." The next day, defendant Woods texted a friend, "Us proud boys are his civilian militia in case violence starts. He knows we're on his side." Ex. 1 at 1.

From November 4-10, 2020, the week after the 2020 election, Woods texted conspiracy theories to friends, including spreading the false claim that fake ballots had been used in the

election, that Trump "watermarked the real ones," *id.* at 8, that the "national guard is going through

them," *id.*, and that "Dems fell for the trap," *id.* at 22. On November 10, 2020, Woods had the

following exchange with a friend, who was saved in his phone as K.M.:

> K.M.:      "You think Trump can pull this out? I wonder how many Trump votes were
>            destroyed to never come back."
>
> Woods:     "In order to have voter Id it has to be this way. We will get trump back in
>            and voter Id will be required for the 2024 election. [ . . . ]"
>
> K.M.:      "Oh ya. It's scary. [ . . . ] We can't let this happen. I will drive to D.C. and
>            join to block Trump in. I hope I have help."
>
> Woods:     "Count me in. Don't think it'll come to that though."

*Id.* at 3-4.

On December 1, 2020, Woods exchanged instant messages with another user on Facebook

in which they discussed the 2020 presidential election and then-President Trump's efforts to hold

on to power. Woods' friend stated, "I want to see all those asshats go to jail too," presumably

referring to the politicians and other people that Woods and his friend believed had engineered or

supported the allegedly fraudulent election. Woods replied that instead of jailed, those people

should be "Hung." Ex. 2 at 2.

On January 4, 2021, Woods texted his friend B.S. that he was "thinking about going to dc

[*sic*] on the 5th and 6th" and asked if B.S. was interested in joining him. Ex. 1 at 10. When B.S.

responded "Possibly," Woods encouraged B.S. to join him by predicting "It's going to be biblical."

*Id.* at 13-14. B.S. agreed to go. A few hours later, Woods texted B.S. and advised him to bring a

"knife and whatever you think. I know dc is gun free. I'm bringing blade." *Id.* at 16. B.S.

responded, "I always have one lol." *Id.* The next day, Woods and B.S. drove together from Auburn,

Illinois to Washington, D.C., where they shared a hotel room. *See id.* at 16-17, Ex. 2 at 4.

### Woods' Entry on U.S. Capitol Grounds on January 6, 2021

On January 6, 2021, Woods and B.S. attended the rally near the Washington Monument and then marched with the mob onto the restricted U.S. Capitol grounds. While standing within the restricted area on the East side of the Capitol, Woods took a photograph of the building—before the police line was breached—and sent it to several friends. *See, e.g.*, Ex. 2 at 5, 7. One friend responded "Hope u get some good pictures. Please don't get arrested…" Another, who also understood Woods was ready for violence, responded, "Nice. The swarm will be coming in an hour or two…Glad you guys made it safe…Grab an Antifa by their hair and send them rollin will ya?" *Id.* at 6.

### Woods' Assault on USCP Officer J.F.

At approximately 2:10 p.m., a group of approximately 15-20 USCP Civil Disturbance Unit ("CDU") officers—all wearing riot gear, including body armor and helmets with face shields—were positioned on the grass just outside the northwest exterior wall of the U.S. Capitol grounds, trying to contain the hundreds of rioters gathered there. *See* Ex. 3 at 00:15.

 

**Image 1 (left):** *aerial photograph of the west side of the Capitol grounds, with the relevant area circled in red.*
**Image 2 (right):** *line of USCP CDU officers (circled in yellow) trying to contain the crowd of rioters, who vastly outnumbered them. Ex. 3 at 00:15.*

The USCP officers attempted to arrest one particularly unruly rioter, but the man violently resisted, requiring five officers to go to the ground to restrain him. Already massively outnumbered, this position rendered those five officers even more vulnerable to the rioters surrounding them, none of whom had been screened for weapons. In an effort to protect the five officers, their colleagues, including USCP Officer J.F., formed a circle around them. *See* Ex. 3 at 00:27-00:37.



**Image 3:** *Officer J.F. (outlined in yellow) standing guard as her colleagues work to subdue and arrest a violent rioter. Ex. 3 at 00:37.*

As Officer J.F. stood guard, a rioter wearing khaki pants and a black top ran up to her and

sprayed her in the face with an orange aerosolized chemical, most likely bear spray, and then ran away. *See* Ex. 3 at 00:41-00:44.



**Image 4:** *Officer J.F. (outlined in yellow) bring sprayed with an orange chemical gas. Ex. 3 at 00:42.*

Officer J.F. sprinted after the sprayer, who headed into the crowd, towards the area where Woods was standing. *See* Ex. 3 at 00:44-00:45.



***Image 5****: Officer J.F. (yellow outline) chasing the man who sprayed her (yellow arrow) as Woods (white arrow) prepares to blindside assault her so as to allow the sprayer to escape. Ex. 3 at 00:45.*

With Officer J.F. running full speed after him, the sprayer turned left just as he passed Woods in an effort to duck into the crowd. *See* Ex. 3 at 00:45. As Officer J.F. approached Woods, Woods took advantage of her attention being focused on the fleeing sprayer, stepped into her path, lowered his shoulder, and rammed into her. *See id.* at 00:45-00:47.



*Image 6*: *Woods stepping into Officer J.F.'s path, lowering his shoulder, and preparing to hit her. Ex. 3 at 00:45.*



*Image 7*: *Woods striking Officer J.F. Ex. 3 at 00:46.*

Woods is 6 feet tall and weighs 220 pounds. PSR ¶ 99. Officer J.F. is 5'4" tall and 120 pounds.

Woods' assault sent Officer J.F. flying, and she crashed into a metal bike rack barricade that had

been toppled to the ground by rioters.[5] *See* Ex. 3 at 00:47-00:50. Woods' assault left Officer J.F.

in an immensely vulnerable position: facedown, injured, alone, and surrounded by a hostile mob.



***Image 8****: Officer J.F. crashing into the metal bike rack barricade as a result of Woods' assault.
Ex. 3 at 00:46.*

---

[5] According to his statement to the FBI, B.S. was standing near where Officer J.F. crashed into
the barricades. Although B.S. did not realize at the time that Woods was the one who attacked her,
B.S observed that *someone* in the crowd assaulted Officer J.F. and understood that the situation
was rapidly escalating into something in which he did not want to participate. B.S. immediately
left the Capitol grounds and returned to the hotel, where he later rendezvoused with Woods. *See*
Ex. 1 at 17.

The next day, Officer J.F.'s whole body was in pain due to Woods' assault; she felt like she'd "been hit by a truck."

### *Woods' Assault on Cameraman G.P.*

On January 6, 2021, a staging area for members of the news media was set up on pavement near the northeast corner of the U.S. Capitol grounds. The staging area was blocked off from the public with metal bike rack barricades. Inside of it, members of the news media from a variety of outlets set up recording and broadcasting equipment. *See generally* Ex. 4.



***Image 9***: *Reuters cameraman G.P. (yellow arrow, dark blue jacket and hat, white mask) standing next to his tripod-mounted camera and others inside the media staging area.*

At approximately 4:50 p.m., Woods joined a group of rioters at the staging area just outside the barricades. Rioters in this group began berating the members of the news media inside the staging area, throwing items at them, and even spitting on them. *See* Ex. 4 at 00:01-01:40. As the rioters' behavior became increasingly agitated and their rhetoric increasingly vitriolic, some of the media members inside the staging area felt endangered and fled, leaving their cameras and other

sensitive, expensive equipment behind. *See id.* at 01:41-01:55.

Rather than being placated by their success at intimidating some of the media members, the mob amped up the mayhem. Rioters climbed over or moved aside the bike rack barricades, entered the interior of the media staging area, and began destroying equipment. One member of the media who was forced to flee the scene estimated that the destroyed equipment from his particular news organization alone was worth between $30,000 and $34,000.

**Image 10**: *Unidentified rioters inside the media staging area destroying a pile of sensitive and expensive recording and broadcasting equipment.*

Woods participated in the pillaging of the media staging area. He was not the first person to climb over or past a barricade, but he was among the first few. *See* Ex. 5 at 00:06-00:10. After defeating the barricade, Woods jogged over to where two other rioters were vandalizing the media's equipment—one by toppling the standing lights, the other by striking it with a flagpole. Woods kicked a stool, knocking it over. *Id.* at 00:13-00:15; Ex. 6 (different video of same event, in slow motion).

14



***Image 11****: Woods (outlined in yellow) kicking over a media stool as another unidentified rioter knocks over media equipment, including tripod-mounted cameras and lighting stands. Ex. 5 at 00:13.*

Soon after, other rioters joined in the rampage: some smashed cameras while others threw equipment, poured water on it, or slammed it on the ground. One rioter even opened lit equipment on fire.

Reuters cameraman G.P. was one of the members of the news media inside the staging area. Immediately after Woods kicked over the stool, he turned and walked toward G.P. Woods circled G.P. menacingly. Ex. 5 at 00:16-00:23. G.P. did not engage with Woods, however. Instead, G.P. grabbed his shoulder-mounted video camera and attempted to walk away from the area. *Id.* at 00:24-00:27. Woods would not let G.P. escape so easily. Woods targeted G.P. and jogged past him, hitting G.P. with his shoulder. *Id.* at 00:27.



***Image 12****: Woods jogging past G.P. and striking him with his shoulder, the first time. Ex. 5 at 00:27.*

G.P. continued walking. *Id.* Given that Woods' shoulder blow failed to knock G.P. off course, intimidate, or hurt him, Woods decided to hit G.P. again, harder. In an attack similar to the one against Officer J.F., but with even more force, Woods took a running start and slammed into G.P. from the side, like an NFL linebacker hunting a quarterback after an interception. G.P. never saw Woods coming. Exs. 7, 8 (slow motion version of Exhibit 7).



***Image 13:*** *Woods running toward G.P. Ex. 7 at 00:05.*



***Image 14:*** *Woods hitting G.P. Ex. 7 at 00:05.*

The blow knocked G.P. off his feet and caused him and his camera to crash to the ground. The camera hit the stone pavers. G.P.'s head came inches away from slamming into the stones as well, but luckily hit the grass instead.



***Image 15:*** *Woods knocking G.P. off his feet. Ex. 7 at 00:05.*



***Image 16:*** *G.P. and his camera crashing to the ground. Ex. 7 at 00:06.*

Woods kept running for a few steps and then turned and smiled widely in callous celebration to a nearby person filming. Ex. 9 at 00:49-00:52.



***Image 17****: Woods smiling after blindside assaulting G.P. Ex. 9 at 00:49.*

Woods showed no regard for G.P.'s well-being whatsoever, never once turning back to check if G.P. was conscious, let alone ambulatory. Instead, Woods continued circling the media staging area.

### *Woods' Communications about the Riot Afterward*

During the evening on January 6, 2021, and in the days immediately afterward, Woods communicated via text message and Facebook with multiple friends and family members about his actions at the Capitol. Rather than displaying any remorse, he was proud that he had "Stormed the capitol," "stormed the grounds past the gates," and "destroyed cnn cameras." He exhibited no remorse whatsoever for his actions, which he admitted were part of an "insurrection." Indeed, Woods viewed the January 6 riot as a necessary part of the effort to keep then-President Trump in power. In the afternoon on January 7, 2021, he texted a friend "Dont [*sic*] give up hope at all. Trump starts playing g [*sic*] his trump card today. I think trump is going to use the executive order now. First step in that order is he has to call for the insurrection to disburse. [*sic*] Which he did last

night. With the executive order. Trump will cease [*sic*] control of all media. Q post from 2018. Goodbye @jack. That's CEO of Twitter." He then corrected "cease" to "Seize."

Though proud of his actions, Woods clearly understood he had committed crimes and could be prosecuted. On January 19, 2021, Woods discussed plans to flee the country with his friend K.M. First, they discussed deleting their Facebook and/or Google accounts, which Woods said he would do "but [I] have my business page there," implying it would hurt him financially. Woods then asked K.M. "What's your plan?" and told K.M. that "I really want to sell it all except motorhome and make a run for it. Don't know where to. Maybe Texas will secede. But then they'll treat them l ke [*sic*] Iraq and invade on false pretenses." Again, Woods' communications reveal a complete lack of remorse and failure to recognize the degree to which his actions—and those of his fellow rioters—imperiled democracy and created one of the darkest days in our country's history.

### *Woods' Charged Drunk Driving and Murder*

On September 9, 2022, Woods pleaded guilty via plea agreement to two counts covering the assaults of USCP Officer J.F. and Reuters cameraman G.P. The Court allowed Woods to remain out on a personal recognizance bond and certain other limited conditions pending sentencing. *See* Minute Order September 9, 2022. Those conditions included the requirement that "The defendant must not violate federal, state, or local law while on release." ECF No. 8 at 1.

Two months later, in the early evening on November 8, 2022, an Illinois local law enforcement officer caught Woods driving 101 miles per hour on the highway. Ex. 10 (state police report narrative) at 1. When the officer approached Woods at the driver's side window, he smelled alcohol coming from Woods' breath, but Woods denied drinking. *Id.* When the officer told Woods

that he would be issuing a speeding ticket, Woods responded that he didn't care what the officer did because he was "looking at ten years in the next couple months" and wouldn't pay it anyway. *Id.* Woods then said he was "done" and was "going to end it" because he was "done with everything" and would not be serving any jail time. *Id.* Woods stated that he "was looking at ten years" and charges of tax evasion for hundreds of thousands of dollars, so he would be worth more dead than alive.[6] *Id.*

The officer tried to calm Woods down and then went back to his patrol car to call his supervisor and alert him to Woods' statements and possible intoxication. *Id.* The officer also called for a backup unit. *Id.* When the officer re-approached Woods, he found that Woods had started his truck's engine. *Id.* The officer asked Woods to turn the engine off, but Woods refused, put the truck in drive, and sped away. *Id.*

Woods entered the highway by going the wrong way through the exit ramp, and then drove the wrong way on the highway, into oncoming traffic at high speed, before crashing into another car and causing a multi-car crash. *Id.* One of the cars burst into flames. *Id.* One of the drivers, Lauren Wegner—a 35-year-old woman—died at the scene. *Id.*; *see also* Ex. 11 (Indictment in *Illinois v. Woods*, 22-CF-1112) at 1-3. Two people traveling in another car—a 61 year-old man and his 54 year-old wife—suffered non-fatal injuries, as did Woods. The male victim suffered spinal disc injuries in his neck and back, two fractured fingers, a fractured knee, and glass in his eyes and hand. Ex. 11 at 5. Meanwhile, the female victim suffered a brain bleed, a head wound requiring 50 stitches to close, a broken back, a fractured rib, and neck pain. *Id.* at 4.

---

[6] Woods told the Probation officer who authored the PSR that he earned $150,000 per year (net) from his business, Auburn Heating and Air, PSR ¶ 115, but that he had not paid taxes since 2017, *id.* ¶ 123.

Woods suffered spinal and foot fractures. As the officer approached Woods to render aid, Woods shouted expletives at the officer and gave his cell phone to an unidentified individual who appeared on scene and then quickly left. Ex. 10 at 2. Woods was transported to the hospital, placed in a cervical collar, and treated. Ex. 12 at 6. Medical staff analyzed the toxicology of Woods' blood, which revealed a .177 blood ethanol (alcohol) percentage, over twice the state's legal limit of .08. *Id.*

While Woods was lying in his hospital bed, guarded by a police officer, an unidentified woman visited him. *Id.* The officer overheard Woods tell the woman, in substance, that when he fled the traffic stop his goal was to crash his car head-on into a semi-trailer truck. *Id.*

On November 16, 2022, an Illinois state grand jury indicted Woods on six charges, including First Degree Murder. Ex. 11. Woods is in state custody awaiting trial in that case.

## III.    THE CHARGES AND PLEA AGREEMENT

On March 23, 2022, a federal grand jury returned a second superseding indictment charging Woods with eight counts, including violations of 18 U.S.C. § 113(a)(4) (striking, beating, and wounding within the territorial jurisdiction of the United States); and 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding certain officers). On September 9, 2022, Woods pleaded guilty to those two offenses pursuant to a plea agreement. *See* Minute Entry for September 9, 2022.

## IV.    STATUTORY PENALTIES

Woods now faces sentencing on the violations of 18 U.S.C. § 113(a)(4) (Count 2) and 18 U.S.C. § 111(a)(1) (Count 3). As noted by the plea agreement and the Presentence Investigation Report ("PSR") issued by the U.S. Probation Office, Woods faces up to one year of imprisonment, a term of supervised release of not more than one year, and a fine up to $100,000 on Count 2. PSR

¶¶ 125, 134, 154. On Count 3, Woods faces up to eight years of imprisonment, a term of supervised release of not more than three years, and a fine up to $250,000. *Id.* ¶¶ 126, 135, 155. In total, he must also pay a mandatory special assessment of $125. *Id.* ¶¶ 156-57.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Woods Should Not Receive a Reduction for Acceptance of Responsibility

Here, the applicable Guidelines are in dispute. The U.S. Probation Office ("Probation") determined that Woods' total adjusted offense level <u>after acceptance of responsibility</u> is 20, PSR ¶¶ 61-63, and his criminal history produces a criminal history category of I, *id.* ¶ 70. Accordingly, Probation calculated Woods' advisory Guidelines range as 33 to 41 months' imprisonment. PSR ¶ 127. The government disagrees with Probation's application of the downward adjustment for acceptance of responsibility and views it as inappropriate and inapplicable in this case.[7] Without it, Woods' applicable Guidelines range is 46-57 months of imprisonment.

The Guidelines provide that if a defendant "clearly" demonstrates acceptance of responsibility for his offense, the offense level can be decreased by two levels. U.S.S.G. §3E1.1(a).

---

[7] Woods' plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained in the PSR. The plea agreement also notes, however, that "the Government is free under this Agreement to seek" an upward departure for "conduct that occurred after the execution of this Agreement" such as "criminal conduct while pending sentencing," Plea Agreement at 4, and that either party may "seek a variance" based on the sentencing factors of 18 U.S.C. § 3553(a). *id.* at 5.

For offense levels of 16 or more, a defendant who qualifies under §3E1.1(a) may receive an additional 1-level decrease upon the government's motion. *See* U.S.S.G. §3E1.1(b).

While entry of a guilty plea and admitting the conduct comprising the offense of conviction and all relevant conduct is "significant" evidence of acceptance of responsibility, such evidence can be outweighed by "conduct of the defendant that is inconsistent with such acceptance of responsibility." *See* U.S.S.G. §3E1.1, cmt. 3. For that reason, the Guidelines specifically state that "[a] defendant who enters a guilty plea is not entitled to an adjustment under [§ 3E1.1] as a matter of right." *Id.*

For the same reason, Woods' plea agreement requires that he demonstrate acceptance of responsibility not just at the time of his plea, but also during the period between his plea and his sentencing. Indeed, the agreement specifically states that "Nothing in this Agreement limits the right of the Government to seek denial of acceptance of responsibility . . . should it be determined by the Government that [Woods] . . . (b) engaged in additional criminal conduct after signing this Agreement." Plea Agreement at 3.[8]

Courts routinely deny the acceptance of responsibility reduction to defendants who engage in further criminal activity while pending sentencing. *See, e.g.*, *United States v. Rush*, 910 F. Supp. 2d 286, 294 (D.D.C. 2012); *United States v. Raimondi*, 620 Fed. App'x 803 (11th Cir. 2015) ("We have consistently found that criminal conduct is a valid basis for denying an acceptance of responsibility adjustment.") (collecting cases); *United States v. Hibbert*, 929 F.2d 434 (8th Cir. 1991); *United States v. Lassiter*, 929 F.2d 267 (6th Cir. 1991). Indeed, in *Puckett v. United States*,

---

[8] The plea agreement further notes that the additional 1-level reduction would be appropriate only if Woods clearly accepted responsibility "to the satisfaction of the Government." *Id.*

the Supreme Court stated that awarding acceptance of responsibility credit to a defendant who committed further crimes while awaiting sentencing "would be so ludicrous as itself to compromise the public reputation of judicial proceedings." 556 U.S. at 143. Subsequent criminal conduct may be considered even if it is unrelated to the underlying offense. *Puckett*, in which the defendant engaged in a scheme to defraud the Postal Service while awaiting sentencing for armed bank robbery, is one such example. *Id.* at 131-133. *See also Rush*, 910 F. Supp. 2d at 294 (denying acceptance of responsibility for subsequent and separate wire and mail frauds against two car insurance companies when underlying conviction was for stealing money from a government agency); *United States v. Pace*, 17 F.3d 341, 343 (11th Cir. 1994) (denying acceptance of responsibility for subsequent marijuana use when underlying conviction was for making false claims).

Here, the three-level downward adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a) is not warranted due to Woods' commission of multiple new felonies while out on bond pending sentencing, specifically drunk driving and murder. *See* Ex. 11. Beyond being criminal (and deadly) conduct, indicating that Woods has not turned away from crime, Woods himself stated that his crimes were motivated in part by his desire to avoid serving a prison sentence in this case. Woods' actions and claimed motivation are thus both inconsistent with acceptance of responsibility and/or remorse.

Probation calculated Woods' criminal history as a category I, which is not disputed. PSR ¶ 70. Accordingly, without the three-level adjustment for acceptance of responsibility, the government calculates that Woods' total offense level is 23, and therefore his corresponding Guidelines imprisonment range is 46-57 months. *Compare* PSR ¶¶ 63, 127 *with* U.S.S.G. §5A.

**B.  The Court Can and Should Impose Its Sentence to Run Consecutively to Any Sentence Imposed by Illinois on the Pending Drunk Driving/Murder Case**

The Court has discretion to order that Woods' federal sentence run concurrently or consecutively to any anticipated state sentence. *See Setser v. United States*, 566 U.S. 231, 236 (2012) (holding that a federal district court retains discretion to order that a federal sentence run consecutively or concurrently "where a federal judge anticipates a state sentence that has not yet been imposed."); *see also* U.S.S.G. §5G1.3(d). Here, the Court should impose a consecutive sentence because the Illinois conduct occurred *after* the conduct at issue in this case, constituted a violation of Woods' bond conditions in this case, and, according to Woods' own words, was in part motivated by his desire to avoid the sentence he anticipated receiving in this case. Imposing a concurrent sentence under these conditions would effectively reward Woods. Given the strength of the Illinois case and the lengthy prison term Woods faces if convicted there, if this Court imposed a concurrent sentence it would create a situation in which, in practical terms, Woods' federal sentence would be of no consequence to him. The Illinois sentence would swallow the federal one. Thus, a concurrent sentence would undermine the Court's sentencing goals of generating general and specific deterrence and promoting respect for the rule of law.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence of the high-end of the Guidelines plus a 24-month upward variance for a total of 71 months of imprisonment.

### A.  Nature and Circumstances of the Offense

As described in more detail above, Woods' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out,

frustrating the peaceful transition of presidential power, and throwing the United States into a constitutional crisis. The nature and circumstances of Woods' offenses were of the utmost seriousness. On January 6 he assaulted a police officer trying to apprehend another rioter who had already assaulted her *and* a member of the news media merely trying to document the day's events. Like every other rioter, Woods contributed to the collective threat to democracy, physical safety, emotional well-being, and property on January 6, 2021.   But Woods is among the most serious offenders because he repeatedly chose to use violence.

As Woods' text messages and Facebook communications reveal, Woods recruited his friend B.S. and drove from Illinois to Washington, D.C. for the express purpose of using force and violence to achieve his political goal: keeping then-President Trump in power. Woods regarded himself as part of a "civilian militia" and he wanted to be in Washington, D.C. on January 6, 2021, to "block [Trump] in," i.e. to stand between President Trump and anyone who would try to remove him from the White House. He anticipated violence ("It's going to be biblical"), prepared for it by bringing a knife, advised his friend to bring a weapon too, and relished the prospect of politicians and other officials being "Hung."

When he arrived on the Capitol grounds, Woods knew a riot was occurring and that his presence was unwelcome. At minimum, he saw a group of 15-20 uniformed USCP officers in full armored riot gear trying to contain the crowd. He saw how outnumbered they were. He saw them try to arrest one rioter; he saw that rioter fight against the police, requiring the efforts of 4-5 of them to subdue him; he saw a different rioter run up to a USCP officer and attack her by spraying an orange chemical gas in her face. He saw the sprayer turn and flee. He saw the USCP officer chase him. None of that deterred Woods or inspired him to leave the Capitol grounds, because he

27

was not there to peacefully protest. Instead, in that moment, Woods seized the opportunity for violence and lawlessness. He chose to help the sprayer escape by viciously assaulting the USCP officer with a blindside hit, sending her sprawling into a metal barricade. Woods identified the *officer*, not the sprayer, as the enemy. He did not just choose violence; he chose anarchy.

Woods apparently identified the media as his enemy as well and sought to terrorize media members. He harassed those media members he found working in the staging area, including G.P. He climbed over barriers meant to protect them while they did their jobs. He participated in the vandalism of their equipment. And when G.P., a defenseless cameraman, tried to leave the area to protect himself, Woods took a running start and plowed into him, sending G.P. flying off his feet and knocking him and his camera to the ground, his head barely missing the stone pavers.

Woods' actions were as cowardly as they were violent and opportunistic. He targeted people smaller than him who did not see him coming. He attacked people who had done nothing whatsoever to even engage with him, let alone harm or block him. Woods not only assaulted his targets but also contributed to the general atmosphere of lawlessness on January 6 where rioters felt free to hurt whomever they wanted, go wherever they wanted, take whatever they wanted, and destroy whatever they wanted, without consequence.

Woods' post-conviction conduct demonstrates the same disregard for the health or safety of others that he showed when attacking Officer J.F. and G.P. Driving at over 100 miles per hour on the highway would have been bad enough; he easily could have killed someone *then*. Driving that fast—let alone while drunk, let alone with over *twice* the legal limit of alcohol in his system— created an immediate and catastrophic risk of death or serious bodily injury to everyone who has the misfortune of sharing the same road. Woods acted with no regard to the lives he was putting

at risk. Just like on January 6, Woods' behavior was cowardly, monstrous, and devoid of any consideration of others.

### B. Woods' History and Characteristics

Apart from this case, Woods has an "extensive history of alcohol related arrests," which are not reflected in his criminal history score. *See* PSR ¶ 108. That history also includes numerous traffic infractions for unsafe driving, *id.* ¶¶ 67, 72-82, 84, a combination that led directly, and tragically, to Woods' November 2022 drunk driving murder. Woods' criminal history category of I thus underrepresents the seriousness and significance of his criminal history, which is one of the reasons the government recommends a 24-month upward variance, the equivalent of two offense levels.

On January 6, 2021, Woods was self-employed, running his own HVAC repair business, and earning a six-figure salary. *Id.* ¶ 115. Yet by his own admission, Woods had not paid any taxes since 2017, despite owning a business and paying himself $150,000 annually from it. *Id.* ¶ 123. Woods' financial behavior fits his pattern. It again demonstrates his criminal refusal to abide by the law and his selfish disregard for the impact of his actions on others.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Woods' criminal conduct—particularly his blindside assault of a uniformed federal officer who was in the midst of pursuing another rioter who had *just* assaulted officers, allowing that rioter to escape—was the epitome of disrespect for the law.

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly

administration of the democratic process."[9]   Like the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.   As Woods entered the Capitol grounds, it must have been abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege by a mob willing to use force to undermine the election. He saw that law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. He saw a handful of officers doing their best to form a protective perimeter around five of their colleagues who were on the ground, struggling to subdue a violent rioter, but the angry mob surrounded them, placing those officers in a precarious position. Woods directly, and physically, added to that danger by his use of violence.   Committing a blindside assault on a uniformed federal officer—who was in the midst of pursuing another rioter who had *just* assaulted officers, allowing that rioter to escape arrest—was the epitome of disrespect for the law.

Additionally, Woods' high-speed flight from the post-plea traffic stop shows that pleading guilty in this case did not change his outlook or inspire him to reform. The Court took a chance on Woods and generously allowed him to remain out on bond conditions pending sentencing, despite Woods having pleaded guilty to two violent crimes. Woods abused that trust and committed multiple new felonies, killing one person and seriously injuring two others, and in the process demonstrating that he did not respect the state police, this Court, or the law in general.

The Court should impose a sentence that takes this continued disrespect for the law into account. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that assaults on police officers are not taken seriously.   In this way, a lesser sentence could

---

[9] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D. The Need for the Sentence to Afford Adequate Deterrence

#### i. General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol, and a lengthy term of imprisonment at that, given that this particular defendant engaged in—and pleaded guilty to—multiple crimes of violence.

#### ii. Specific Deterrence

The need for the sentence to provide specific deterrence to Woods particularly also weighs heavily in favor of a lengthy term of incarceration.

Woods' private text messages to friends and family in the days following January 6 show that Woods knew his conduct was unlawful and aimed at overthrowing the government, but that he was proud of his actions. Indeed, on January 7, Woods unrepentantly referred to his actions as part of "the insurrection," which he deemed "necessary" to keep President Trump in power. Just under two weeks later, Woods discussed fleeing to escape the consequences of his actions. And two months after pleading guilty, Woods fled a traffic stop. Woods claimed he did so, in part, to avoid serving the very sentence the Court will impose in this case. Any superficial expression of remorse by Woods now is empty, a belated and transparent attempt by Woods to convince the

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Court to go easy on him. *See United States v. Matthew Mazzocco*, 1:21-cr-54 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble.")

As shown by his conduct on January 6—as well as his subsequent drunk driving murder and refusal to pay taxes since 2017—Woods is impulsive, has no regard for others, and has no qualms about breaking the law to serve his own ends. He has shown no genuine remorse for his criminal actions, violent and otherwise, and thus the Court should impose a lengthy sentence of incarceration to deter him from future crimes.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national

sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.    **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).[11]

But Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*,

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12]   While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, particularly Woods' post-plea felonies in violation of his bond conditions, Woods' case is most analogous to others who—like Woods—traveled to Washington, D.C. with the expectation and intent to engage in violence, committed multiple assaults, and showed little to no remorse for their actions.

For example, in *United States v. Palmer*, 1:21-cr-328 (TSC), the defendant joined in the attack on officers guarding the Lower West Terrace entrance to the Capitol, colloquially known as the "tunnel." There, Palmer threw a wooden plank at officers, sprayed the contents of a fire extinguisher at the officers, and then, when it was empty, threw it at them twice. Later, on the West Plaza, Palmer threw a 4-5 foot pole at a separate group of officers. After pleading guilty via plea agreement, but while pending sentencing, Palmer posted a public fundraising appeal online falsely claiming that his actions on January 6 were purely defensive; accordingly, Judge Chutkan declined to award Palmer a three-level reduction for acceptance of responsibility. Ultimately Judge Chutkan sentenced Palmer to 63 months of incarceration, which was the low end of Palmer's Guidelines range of 63 to 78 months.

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Similarly, in *United States v. Ponder*, 1:21-cr-259 (TSC), the defendant assaulted three different officers on the West Plaza with poles. After the third assault, Ponder was detained, but the officers were forced to release him when they discovered they had no means to transport him to a jail. Instead of complying with the officers' instruction that he leave the Capitol grounds, Ponder maneuvered his way to the mouth of the Lower West Terrace tunnel and tried to use a stolen riot shield to push into the line of officers. Judge Chutkan sentenced Ponder to 63 months of incarceration, which was slightly below the midpoint of Ponder's Guidelines range of 57 to 71 months.

Woods' conduct on January 6 was worse than both Palmer and Ponder's for several reasons, and he consequently deserves a comparatively harsher sentence. First, Woods' pre-January 6 Facebook and text message communications indicate that he anticipated violence, welcomed it, prepared for it, brought a knife to facilitate it, and recruited his friend B.S. to come with him to D.C. and do the same. Palmer and Ponder did not have comparable pre-January 6 preparations or communications. Second, while Palmer and Ponder engaged in a larger number of assaultive actions than Woods on January 6, neither Palmer nor Ponder injured anyone, unlike Woods, who at minimum injured Officer J.F.[13] Third, because of the Guidelines' grouping rules, Woods' second assault—his attack on defenseless cameraman G.P.—does not raise his Guidelines at all; from a Guidelines standpoint, Woods—unlike Palmer and Ponder—faces no greater penalty for having engaged in multiple assaults rather than one. Fourth, Palmer and Ponder pleaded guilty relative early in their cases, whereas Woods did not plead guilty until

---

[13] As explained in note 3, the government does not know if G.P. was injured by Woods' attack despite multiple efforts to interview him.

shortly before trial, well after the government had begun preparing exhibits and witnesses. Finally, Palmer's post-plea conduct pales in comparison to Woods' commission of multiple new felonies, which killed one person and seriously injured two others, while he was out on bond pending sentencing. For these reasons, Woods should receive a higher sentence than either Palmer or Ponder.

Accordingly, the government's recommendation of a 71-month prison sentence would not produce unwarranted sentencing disparities. Indeed, in light of the *Palmer* and *Ponder* sentences, the 24-month upward variance requested by the government is appropriate to *avoid* unwarranted sentencing disparities.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[14] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[14] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The police victim in this case suffered bodily injury as a result of Woods' conduct but did not incur any medical expenses as a result. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Woods must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Woods played in the riot on January 6.[15] As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $ 2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol as of October 14, 2022. *Id.* Woods' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 124.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 71 months of incarceration; three years of supervised release; $2,000 in restitution; and the mandatory $125 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Michael M. Gordon*
         MICHAEL M. GORDON
         Florida Bar No. 1026025
         Assistant United States Attorney, Detailee

---

[15] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

601 D St., NW
Washington, D.C. 20530
Telephone: (813) 274-6370
michael.gordon3@usdoj.gov

s/ *Brian D. Brady*
Brian D. Brady
Trial Attorney, Detailee
D.C. Bar No. 1674360
601 D St., NW
Washington, D.C. 20530
Telephone: (202) 834-1916
Brian.Brady@usdoj.gov